# American Pig Iron Storage Warrant Company, Appellant, *v.* Sinnemahoning Iron & Coal Company.

*Landlord and tenant—Distress—Bailment—Warehouse receipt.*

Where a furnace company manufactures pig iron in large quantities from ore and coal on demised premises, and stores it on the premises near the furnace, and subsequently a warehouse company sublets from the furnace company the small piece of land upon which the pig iron is stored, and places a wire fence around it, and thereafter issues warehouse warrants against the iron, and no notice is given to the landlord, and there is no power to sublet in the lease, the landlord's right of distress for rent is good as against the holders of the warrants.

One who takes warehouse warrants must run the risk of the warehouseman issuing a warrant for goods that were never legally put in his possession by a landlord, who had a prior right of lien.

Argued March 17, 1903. Appeal, No. 326, Jan. T., 1902, by plaintiff, from judgment of C P. Cameron County, Feb. T.,

1901, No. 13, on trial by court without a jury in case of American Pig Iron Storage Warrant Company v. Sinnemahoning Iron & Coal Company and Fred W. Yentzer. Before MITCHELL, DEAN, FELL, BROWN and POTTER, JJ. Affirmed.

Replevin for pig iron.

MAYER, P. J., filed the following opinion :

### FINDINGS OF FACT.

We find the following facts:

1. On April 19, 1899, the Sinnemahoning Iron & Coal Company leased its coal and iron property, consisting of about 10,000 acres of land, on which were coal mines, coke ovens, and a blast furnace, to Frank B. Baird for a period of three years, at a minimum annual rental of $14,000, payable quarterly, on October 20, January 20, April 20, and July 20, including all rents earned on the first days of these months, respectively, and the lessee took possession of the premises under the lease.

2. On December 21, 1899, Frank B. Baird assigned the lease to Chester R. Baird.

3. Chester R. Baird assigned the lease or sublet the demised premises to a New Jersey corporation, called the Emporium Furnace Company, and a large amount of pig iron was made under the management of this company on the demised premises and placed in its yard near its cast house and furnace from day to day as it was made, said yard being part of the demised premises.

4. On July 25, 1900, and August 24, 1900, the Emporium Furnace Company entered into three leases with the American Pig Iron Storage Warrant Company, a New Jersey corporation, subleasing to it three contiguous pieces of the demised premises lying near the cast house, and embracing that part of the yard where it had piled pig iron. There was then on the ground so sublet upwards of 7,000 tons of pig iron.

5. The Emporium Furnace Company continued to manufacture pig iron after this subletting, and substantially all they made was carried from the cast house to the land sublet to the storage warrant company and there piled.

6. On October 29, 1890, when the first landlord's warrant

was issued, there were about 11,000 tons of pig iron altogether on this storage lot.

7. The storage company issued warrants for all this iron to C. R. Baird, who claimed to have bought it from the Emporium Furnace Company, and the warrants so issued were pledged by C. R. Baird to banks as collateral for his notes prior to the issuing of the landlord's warrant, October 29, 1900.

8. On October 29, 1900, there was due to the Sinnemahoning Iron & Coal Company, from Frank B. Baird as rent on the lease, $7,536.36, and on that day a landlord's warrant was issued and 1,500 tons of pig iron in the storage company's yard was distrained for rent. The iron so distrained was on the premises leased by the Sinnemahoning Iron & Coal Company to Frank B. Baird, and the warrant was issued against Frank B. Baird as tenant.

9. After distraint, and before sale on the landlord's warrant, the American Pig Iron Storage Warrant Company brought replevin for the iron so distrained.

10. It appears that C. R. Baird is a brother of Frank B. Baird; that C. R. Baird & Company is C. R. Baird; that the Emporium Furnace Company is Frank B. Baird, C. R. Baird, and a clerk of C. R. Baird & Company. It further appears that C. R. Baird furnished the capital and management of the Emporium Furnace Company; that he arranged with the storage company to lease the ground and accept the iron; that he directed the iron to be put in the storage yard, and also directed when it was to be taken out.

11. Possession was taken by the lessee, Frank B. Baird, of the entire demised property, the blast furnace put into operation, and upwards of 11,000 tons of pig iron made and piled on the leased premises prior to the distraint.

12. The rent for the month of October, 1900, was distrained for and an agreement made, by which the iron seized was released, and the same questions being raised under that distress as are in this case, the result of that distress is to depend upon the result of this case, and if a recovery is had by the landlord, the amount of the rent due on the second distraint, which is $1,732.94, shall be included in the recovery in this case.

13. There was due and unpaid on the demised premises seated taxes in Lumber township for the year 1900, amounting

to $190.56 and in Emporium borough seated taxes on the demised premises, amounting to $367.29, and the unseated taxes for Lumber township for the year 1900, amounting to $336.54, and for Shippen township the unseated taxes for 1900, amounting to $229.73, which the lessee obligated himself to pay.

14. The leases to the American Pig Iron Storage Warrant Company by the Emporium Furnace Company were never recorded, nor were they assented to by the Sinnemahoning Iron & Coal Company, nor ratified by them in any way.

### CONCLUSIONS OF LAW.

1. The evident intent and purpose of the lease between the Sinnemahoning Iron & Coal Company and Frank B. Baird, dated April 19, 1899, was to enable the lessee to take possession and assume control of the entire demised premises and utilize the same for the purpose of making pig iron.   It was not within the contemplation of the parties that the said lessee would sublet a portion of the demised premises to another corporation for the purpose of carrying on an independent business in no way necessarily connected with the business contemplated by said lease.

2. The general rule is that whatever goods and chattels the landlord finds upon the demised premises, whether they belong to the tenant, under tenant, or a stranger, are distrainable by him for rent : Kessler v. McConachy, 1 Rawle, 435 ; Price v. McCallister, 3 Grant, 248 ; Karns v. McKinney, 74 Pa. 387 ; Kleber v. Ward, 88 Pa. 93 ; Whiting v. Lake, 91 Pa. 349 ; Murphy v. Borland, 92 Pa. 90 ; Page v. Middleton, 118 Pa. 546.

To this general rule are exceptions : First, fixtures which are annexed to the freehold and become part of it; second, chattels placed on the premises " to be wrought, worked up, or managed in the way of the tenant's trade or employment," as in the case of a tailor, warehouse keeper, boarding house keeper, and livery stable, etc.

In Brown v. Sims, 17 S. & R. 138, it was held that " the goods of a third person placed, in the way of trade, on storage in the warehouse of one who used the trade and business of a merchant, and received goods and merchandise from merchants

and traders on storage, are not liable to distress for rent for such warehouse, though found on the premises."

In this case Justice GIBSON said : " Where the course of the business must necessarily put the tenant in possession of the property of his customers, it would be against the plainest dictates of honesty and conscience to permit the landlord to use him as a decoy and pounce upon whatever should be brought within his grasp, after having received the price of its exemption in the enhanced value of the rent. . . . To take goods on storage, though not the appropriate business of our merchants, is of such common occurrence as to furnish an intendment that it enters into the consideration of the parties to every lease of a warehouse.   The landlord knows that it is to be used for the general purposes of trade, and as this sort of bailment usually forms a part of the business of commerce, we are bound to say the parties had regard to it as one of the usages of trade, and the landlord must, therefore, be considered as having waived his privilege in this particular instance."

In the present case it is not pretended or claimed that when the lease was made between the parties that they had in view the subletting of these premises to the storage company for the purpose of storing iron made at said furnace.

3. " The goods of a subtenant are liable to be distrained for rent of the original tenant, under whom he claims, and who has surrendered his lease in the middle of the term : " Hessel v. Johnson, 45 Legal Int. 474.

" A subtenant cannot compel the lessor to sell the goods of the original lessee, in satisfaction of the rent in arrears, before having recourse to his own : " Jimison v. Reifsneider, 97 Pa. 136.

" The goods of one who entered under the lessee are liable to be distrained for the rent reserved, though he hold over after the determination of the lease : " Whiting v. Lake, 91 Pa. 349.

" The goods of a stranger in the possession of the tenant, as a matter of favor and without hire, are not exempt from distress for rent : " Page v. Middleton, 118 Pa. 546.

Under the authority of these cases our conclusion is that the pig iron piled in the storage yard of the American Pig Iron Storage Warrant Company does not come within any of the excep-

tions to the general rule that property found on the demised premises is distrainable for rent.

The court entered judgment for defendant.

*Errors assigned* were in dismissing exceptions to adjudication, and in entering judgment for defendant.

*B. Gordon Bromley* with him *C. H. M'Cauley* and *Thomas De Witt Cuyler*, for appellant.—The mere fact that the storage yard of the plaintiff constituted only part of the demised premises, does not take away its character as a warehouse : Connah v. Hale, 23 Wend. 462.

In order to render a warehouseman liable, it is not necessary that the goods intended to be delivered should be housed; it is enough if in custody for housing : Bank v. Doyle 91 N. Y. 32 ; Rodgers v. Stophel, 32 Pa. 111.

The warrants issued by the storage warrant company are in the nature of ordinary negotiable warehouse receipts : Willets v. Hatch, 17 L. R. A. 193 ; Geilfuss v. Corrigan, 37 L. R. A. 166 ; Bucher v. Com., 103 Pa. 528.

Goods which by the usage and for the benefit of trade are on the premises, are exempt : Karns v. McKinney, 74 Pa. 387.

Goods stored in the warehouse of a subtenant are equally privileged from distress as those stored in the warehouse of the tenant : Walker v. Johnson, 4 McCord, 552.

For the purpose of bringing the iron within the exemption, it was unnecessary that it should have been first shipped away from the furnace company and then returned to the warehouse of the storage warrant company, a constructive delivery to the demised premises being sufficient : Clarke v. Millwall Dock Co., L. R. 17 Q. B. Div. 494.

The things included in the class of exemption under consideration, viz. : things delivered to a person exercising a public trade, to be carried, worked up, wrought or managed in the way of his trade or employ, are privileged from distress for the benefit of trade and commerce : Riddle v. Welden, 5 Wharton, 9 ; Connah v. Hale, 23 Wend. (N. Y.) 462; Gilman v. Elton, 3 Brod. & Bing. 75 ; Owen v. Boyle, 22 Maine, 47.

Inasmuch, then, as the underlying reason for the exemption of the goods of a stranger on the demised premises by way of

trade is that the privilege is extended for the benefit of trade and commerce, and, as we have seen, goods stored in a warehouse have been especially brought within the rule in Pennsylvania, all the more should the exemption apply in this case, for, not only were the goods distrained on storage in a warehouse on the demised premises, but they were represented by outstanding warrants or warehouse receipts, which, in this state, are carefully protected by statute, and in addition iron warrants have had a universal commercial sanction for over half a century in England, and for a long period in America: Gibson v. Stevens, 8 How. 384; Geilfuss v. Corrigan, 95 Wis. 651 (70 N. W. Repr. 306); Easton v. Hodges, 18 Fed. Repr. 677.

The storage warrant company was engaged in an independent business on the demised premises, in every way necessarily connected with the business of the manufacture and sale of iron as contemplated by the lease, and being so, the reason of the rule of exemption, i. e., that trade and commerce are benefited, especially applies.

*Johnson & McNarney*, with them *W. W. Webb*, for appellees.—
The lease to Frank B. Baird was for a definite purpose and did not contemplate any subletting for any purpose, much less for the purpose of a warehouse such as the appellants claim to have established. Whatever goods and chattels the landlord finds upon the premises, whether they in fact belong to the tenant, under tenant or a stranger are distrainable by him for rent: 3 Blackstone, chap. 1, p. 8; Kessler v. McConachy, 1 Rawle, 435; Price v. McCallister, 3 Grant, 248; Karns v. McKinney, 74 Pa. 387; Myers v. Esery, 134 Pa. 177.

The business of the storage company, appellant, upon the demised premises is not embraced within any of the exceptions to the general rule and there is no rule recognized in Pennsylvania that will exempt this iron from distress by the paramount landlord for rent due him: Com. v. Westinghouse Electric & Mfg. Co., 151 Pa. 265; Albright v. Byers-Allen Lumber Co., 204 Pa. 71.

The rule or principle governing the exceptions, exempting property from distress in Pennsylvania, is well settled: Brown v. Sims, 17 S. & R. 138; Karns v. McKinney, 74 Pa. 387; Myers v. Esery, 134 Pa. 177.

OPINION BY MR. JUSTICE DEAN, April 20, 1903:

In April, 1899, Frank B. Baird leased from the Sinnemahoning Iron & Coal Company, a corporation, its furnace property in Cameron county, consisting of about 10,000 acres of land, with blast furnace, coal washers, mines, coke ovens, railroad sidings, and like improvements for three years from date of lease. The lessee covenanted to pay a minimum annual rental of $14,000 quarterly, and on the execution of the lease at once took possession. The lease was to be binding upon both parties, their heirs, executors, administrators and assigns. There was no express provision as to subletting or restriction as to terms of sublease; so it may be assumed that there was plainly an implication of a right to sublet. In December, 1899, the tenant assigned his lease to Chester R. Baird, and he assigned it to the Emporium Furnace Company, a corporation promoted by Baird, and this company continued to manufacture pig iron in large quantities, piling it up on the property near the casting house from day to day as it was manufactured. By this method of conducting its business the furnace company had accumulated on the premises about 7,200 tons of pig iron when it leased this small part of the land to the Philadelphia Warehouse Company for warehouse purposes; then on July 25, 1900, the Warehouse company leased that part of the land to the American Pig Iron Storage Warrant Company, a New Jersey corporation, having under our statutes full authority to do business in Pennsylvania, such as to receive iron on storage and to issue its negotiable warrants therefor. It had a large quantity of this pig iron near the furnace in its storage yard a few feet from the furnace, which had been manufactured at the furnace and on which it had issued warrants, many of them to the furnace company and to C. R. Baird & Company, the first lessees from the owner. The lessees fell in arrears for rent to the amount of $7,536.36; a landlord's warrant was issued to Constable Yentzer who by virtue of it seized the pig iron in the alleged storage yard of the American Pig Iron Storage Warrant Company, this appellant; this latter company then replevied the iron seized by the constable, alleging the iron was not lawfully subject to distraint for rent, it being the property of the storage warrant company. When the case came on for

trial the parties by agreement submitted the issue, both fact and law, to the decision of the court under the act of 1874.

The court in opinion filed gave judgment for the Sinnemahoning Iron Company, and the constable, thus in effect, holding that the iron was subject to distress for rent. From that judgment comes this appeal by the storage warrant company with twenty-one assignments of error. The subject of all of them is so fully discussed in the opinion of the learned judge of the court below, that but little further need be here said. The only question raised in our minds as to the correctness of the legal conclusion of the court has its source in the Act of the 24th of September, 1866, P. L. (1867) 1363. That act after authorizing the issuing of warrants by warehousing companies and making such warrants negotiable, goes on to say: "And any person to whom the said receipt or bill of lading may be so transferred shall be deemed and taken to be the owner of the goods, wares and merchandise therein specified, so as to give security and validity to any lien created on the same, subject to the payment of freight and charges thereon."

This act was obviously framed for the protection of the warrant holders and it is the duty of the courts to give full effect to its intent, but they cannot go further and by construction disregard or subvert the law which long settled the rights of a landlord to distrain for rent the goods on the demised premises. But for this act, there could be no question raised as to the right of the landlord to seize this iron made in the leased furnace from ore and coal mined on the leased land. It had been taken from the casting house and piled about the same distance from the furnace as it would have been, had there been no transfer to the storage company. The warrant itself does not determine and fix that the iron has been warehoused; there must have been an actual change of possession ; any other ruling would suggest a most fruitful method of fraud which is not warranted by any reasonable interpretation of the act.

Notice the character of warehousing done here; the lessee was in arrears for more than a quarter's rent ; the iron manufactured before and during that quarter had been piled up just where it lay when seized ; at the end of the quarter the storage company leased from the tenant the small piece of land on which the iron was piled, ran a wire fence around it and claims

that it was stored by the storage company on its premises, therefore under the act of 1866 it is not subject to distress for rent. Notice of this subletting was not given the landlord. It was answered, he was not entitled to notice. This may be, if the subletting was for the same purpose as the orignal lease, the manufacture of iron; but this sublease was for warehouse and storage purposes ; it may well be doubted whether the implied right of the first lessee to assign a right to manufacture iron embraced the right to assign a part of the demised premises for other and distinct purposes. But the finding of fact by the court below clearly vindicates the judgment on another ground. Appellant argues that the rule as announced by GIBSON, C. J., in Brown v. Sims, 17 S. & R. 138, must control the case before us. It may be said that Brown v. Sims was no modification of or departure from the common-law rule, that the goods on the demised premises are liable to distress for rent; it is merely an exceptional case on its facts as appears from the language of the opinion thus : " Where the course of the business must necessarily put the tenant in possession of the property of his customers it would be against the plainest dictates of honesty and conscience to permit the landlord to use as a decoy and pounce upon whatever should be brought within his grasp, after having received the price of its exemption in the enhanced value of the rent." From that follows a long line of exceptional cases on similar facts down to Karns v. McKinney, 74 Pa. 387, where after an elaborate discussion of most of them the exceptions to the rule are all embraced in these few words : " When the tenant in the course of his business is necessarily put in possession of the property of those with whom he deals or those who employ him, such property, although upon the demised premises, is not liable to distress for rent due thereon from the tenant."

This pig iron did not come upon the demised premises from the possession of a third person; it was manufactured and piled there by the tenant; it was not, necessarily, there for any purpose ; appellant ran a wire fence around it and left it there for its own convenience and then assumed it was in its storage yard or warehouse, without even notice to the landlord, that there had been a constructive change of ownership. These findings of fact by the court below bring the iron under the operation of

the general rule, that the goods on the demised premises are distrainable for rent and which does not encourage what Blackstone calls "a dangerous combination between strangers and tenants to defraud the landlord of his rent;" or as the court below puts it, "all that would be necessary, as was done in this case, would be to deposit the entire output in this storage yard and when there deposited, claim that it was exempt from distress for rent." On the facts as found this question is not affected by the act of 1886. If the landlord had hauled his iron to appellant's storage yard and placed it in their custody and control and they had issued warrants upon it, the holder of the warrant would have been protected by that act; nevertheless, while the act hedges around the owner of the warrant with almost every possible protection, he must run the risk of the warehouseman issuing a warrant upon goods, that never were legally put in his possession by a landlord who has a prior right of lien.

All the assignments of error are overruled and the judgment is affirmed.